**Raymond P. ZAJAC and Helen Ann Zajac, Appellants,**

v.

**FEDERAL LAND BANK OF ST. PAUL, Appellee.**

No. 88–5353.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1988.

Decided Oct. 5, 1989.

Rehearing En Banc Granted Dec. 7, 1989.*

Richard J. Linnerooth, Fargo, N.D., for appellants.

James B. Loken, Minneapolis, Minn., for appellee.

Before HEANEY * and FAGG, Circuit Judges, and HANSON,** Senior District Judge.

HEANEY, Senior Circuit Judge.

Raymond and Helen Zajac, a North Dakota farm couple, appeal from a decision of the district court holding that the Agricultural Credit Act of 1987 (Act) does not provide the Zajacs with a private right of action to enjoin the Federal Land Bank of St. Paul (Bank) from foreclosing on the Zajacs' property until the Bank honors their request that an independent appraiser be appointed to appraise their property for purposes of restructuring their distressed loan with the Bank.

We hold that the Zajacs have a private right of action under the Act to require the appointment of an independent appraiser and remand to the district court for action consistent with this opinion.

BACKGROUND

In 1980, the Zajacs borrowed $250,000 from the Bank. By 1986, they were unable to continue making payments, and the

---

* The HONORABLE GERALD W. HEANEY assumed senior status on December 31, 1988.

** The HONORABLE WILLIAM C. HANSON, United States Senior District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

Bank commenced foreclosure proceedings in state court. The Zajacs raised a number of defenses to the action. On December 14, 1987, the state court issued a decision in favor of the Bank.

The Bank delayed entry of its state court foreclosure judgment to afford the Zajacs an opportunity to restructure their loan under sections 102 and 106 of the Agricultural Credit Act of 1987, 12 U.S.C. §§ 2202 and 2202a.

The Zajacs submitted an application for restructuring, which was considered but denied by the Bank on April 15, 1988, on the ground that the Bank would incur a greater loss under the Zajacs' restructuring proposal than would occur through a sale of the property at foreclosure. The Zajacs appealed that decision to the Bank's credit review committee. They asked the committee to appoint an independent appraiser pursuant to procedures required by the Act. The committee refused and, after a hearing, denied the Zajacs' application for restructuring. Judgment of foreclosure was entered by the state court on May 6, 1988.

The Zajacs appealed the judgment of foreclosure to the Minnesota Supreme Court and moved for a stay of judgment. The motion was denied, and the trial court was affirmed.

■ At that point, the Zajacs asked the United States District Court to enjoin the Bank from conducting a sheriff's sale on their land until it had complied with certain borrowers' rights provisions of the Act, including the provision mandating an independent appraisal.[1] The district court denied the Zajacs' motion after hearing. It held that there is no expressed or implied private right of action for failure to comply with the borrowers' rights provisions of the Act, that the Act did not require an independent appraisal of the Zajacs' land,[2] that the Bank's decision to deny restructuring was a commercial banking decision and that the relief requested would violate the Federal Anti–Injunction Act, 28 U.S.C. § 2283.

## DISCUSSION

### I. IS THE BORROWER'S PROCEDURAL RIGHT TO HAVE AN INDEPENDENT APPRAISER APPOINTED ENFORCEABLE IN FEDERAL COURTS?

■ The Agriculture Credit Act of 1987 does not provide an explicit private right of action to a borrower. Thus, the question is whether a borrower has an implied cause of action to enforce the independent appraisal procedures required by the Act.

The Act provides detailed procedures and formulae under which a borrower can seek

---

1. The Zajacs asserted in district court that they had been denied the right to an independent appraisal by the credit review committee, that Ken Bergh, CEO of the Bank, hated the Zajacs, that Bergh was on the credit review committee in violation of the Act, that if the committee would adopt the Zajacs' figures and methodology a different result could be reached on the analysis of cost of foreclosure as opposed to cost of restructuring, and that irreparable injury would result if the sheriff's sale was not enjoined. The only issue raised on appeal, however, is whether the trial court erred in holding that the Zajacs did not have a private cause of action to enforce their right to an independent appraisal prior to review by the credit review committee.

2. The lower court concluded from the statutory language that credit review committees have no legal obligation to appoint an independent appraiser in restructuring situations. The Zajacs argue that the lower court's interpretation is incorrect because it ignores the Agricultural Technical Corrections Act of 1988, which clearly

states that borrowers have a right to an independent appraisal on review of a denial of restructuring. The Bank argues that the Technical Corrections Act should not apply retroactively in this case. We disagree with the Bank and hold that the district court erred. Section 1001 of the Technical Corrections Act provides that the amendments made by the Act "shall take effect as if enacted immediately after the enactment of the 1987 Act." Pub.L. No. 100–399, § 1001, 102 Stat. 989, 1008 (1988). Since the Agricultural Credit Act of 1987 became operative on January 6, 1988, the Technical Corrections Act became operative well before the Zajacs requested the independent appraisal in April of 1988. Moreover, there is no manifest injustice to the Bank from such retroactive application because the Bank presumably knew the state of the law in May of 1988 when it denied the Zajacs' request for an independent appraisal. Thus, the cases cited by the Bank in its brief are inapposite.

to have a distressed loan restructured.[3] The bank is to restructure loans unless the cost of restructuring exceeds the cost of foreclosure.[4] Restructuring is defined as follows:

> The terms "restructure" and "restructuring" include rescheduling, reamortization, renewal, deferral of principal or interest, monetary concessions, and the taking of any other action to modify the terms of, or forbear on, a loan in any way that will make it probable that the operations of the borrower will become financially viable.

12 U.S.C. § 2202a(a)(7). If the lender rejects the request for restructuring, further procedures can be instituted by the borrower. The borrower can request a review of that decision. 12 U.S.C. § 2202(b)(1). As an aspect of that review, the Act grants a borrower the right to an independent appraisal. 12 U.S.C. § 2202(d).

In determining whether the Zajacs have an implied cause of action to assert a borrower's procedural right to an independent appraisal and other mandated procedures under the Act, the question of congressional intent is the ultimate issue and "unless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Thompson v. Thompson*, 484 U.S. 174, 108 S.Ct. 513, 520, 98 L.Ed.2d 512 (1988). We hold, however, that the necessary intent is found in the language and structure of the 1987 Act, as well as its legislative history and general purpose.[5]

---

**3.** 12 U.S.C. § 2202a(a)(3) provides as follows:
The term "distressed loan" means a loan that the borrower does not have the financial capacity to pay according to its terms and that exhibits one or more of the following characteristics:
(A) The borrower is demonstrating adverse financial and repayment trends.
(B) The loan is delinquent or past due under the terms of the loan contract.
(C) One or both of the factors listed in subparagraphs (A) and (B), together with inadequate collateralization, present a high probability of loss to the lender.

**4.** 12 U.S.C. § 2202a(a)(2) and (e) provide as follows:
(a)(2) **Cost of foreclosure**
The term "cost of foreclosure" includes—
(A) the difference between the outstanding balance due on a loan made by a qualified lender and the liquidation value of the loan, taking into consideration the borrower's repayment capacity and the liquidation value of the collateral used to secure the loan;
(B) the estimated cost of maintaining a loan as a nonperforming asset;
(C) the estimated cost of administrative and legal actions necessary to foreclose a loan and dispose of property acquired as the result of the foreclosure, including attorneys' fees and court costs;
(D) the estimated cost of changes in the value of collateral used to secure a loan during the period beginning on the date of the initiation of an action to foreclose or liquidate the loan and ending on the date of the disposition of the collateral; and
(E) all other costs incurred as the result of the foreclosure or liquidation of a loan.

\* \* \* \* \* \*

(e)(1) **Restructuring in general**
If a qualified lender determines that the potential cost to such qualified lender of restructuring the loan in accordance with a proposed restructuring plan is less than or equal to the potential cost of foreclosure, the qualified lender shall restructure the loan in accordance with the plan.
(2) **Computation of cost restructuring**
In determining whether the potential cost to the qualified lender of restructuring a distressed loan is less than or equal to the potential cost of foreclosure, a qualified lender shall consider all relevant factors, including—
(A) the present value of interest income and principal forgone by the lender in carrying out the restructuring plan;
(B) reasonable and necessary administrative expenses involved in working with the borrower to finalize and implement the restructuring plan;
(C) whether the borrower has presented a preliminary restructuring plan and cash-flow analysis taking into account income from all sources to be applied to the debt and all assets to be pledged, showing a reasonable probability that orderly debt retirement will occur as a result of the proposed restructuring; and
(D) whether the borrower has furnished or is willing to furnish complete and current financial statements in a form acceptable to the institution.

**5.** Several courts have held that the 1987 Act creates an implied private right of action. *Griffin v. Federal Land Bank of Wichita*, 708 F.Supp. 313 (D.Kan.1989) (implicitly allowing a private right of action but finding no violation); *Leckband v. Naylor*, 715 F.Supp. 1451 (D.Minn.1988) (allowing a private right of action to enforce right of first refusal), *appeal dismissed*, No. 88–5301 (8th Cir. June 8, 1989); *Martinson v. Feder-*

## A. Language and Structure

The 1987 Act emphasizes that borrowers have the power to initiate certain procedures. Part C of the Act is entitled *"Rights of Borrowers; Loan Restructuring."* One of the procedures that borrowers can initiate is the right to an independent appraisal at the credit review committee stage of a restructuring proceeding. The pertinent part of the Act reads as follows:

> An appeal filed with a credit review committee under this section may include, as a part of the request for a review of the decision filed under subsection (b)(1) or (2) of this section, a request for an independent appraisal, by an accredited appraiser, of any interests in property securing the loan (other than the stock or participation certificates of the qualified lender held by the borrower).

> \* \* \* \* \* \*

> Within 30 days after a request for an appraisal under paragraph (1), the credit review committee shall present the borrower with a list of three appraisers approved by the appropriate qualified lender from which the borrower shall select an appraiser to conduct the appraisal the cost of which shall be borne by the borrower and *shall consider the results of such appraisal in any final determination with respect to the loan.*

> \* \* \* \* \* \*

> A copy of any appraisal made under this subsection shall be provided to the borrower.

12 U.S.C. § 2202(d)(1), (2) and (3) (emphasis added).

The language requiring the appointment of an independent appraiser upon request is mandatory rather than permissive. The System lender is directed to follow the statutory procedure—the only discretion left to the lender and the credit review committee is to present the borrower with a list of three appraisers from which the borrower can select. Having done this, the committee is mandated to consider the results of the appraisal in any final determination with respect to the loan.

The language used by Congress with respect to the other borrowers' rights provisions is also mandatory in setting forth exceedingly detailed procedures that System lenders must follow. Thus, the Act provides, *inter alia:*

(a) That when it is determined that a loan made by a lender is distressed, the lender *shall* provide written notice to the borrower that the loan may be suitable for restructuring. 12 U.S.C. § 2201(b).

(b) That not later than 45 days before a lender begins foreclosure proceedings, the lender *shall* notify the borrower that the loan may be suitable for restructuring. 12 U.S.C. § 2202a(b)(2).

(c) That *no lender may* foreclose a distressed loan before the lender has completed consideration of the loan for restructuring. 12 U.S.C. § 2202a(b)(3).

(d) That the lender *shall* provide a reasonable opportunity for the borrower to meet personally with a representative of the lender. 12 U.S.C. § 2202a(c).

(e) That if the lender determines that the potential cost of restructuring a loan in accordance with a post-restructuring plan is less than or equal to the potential cost of foreclosing, the qualified lender *shall* restructure the loan in accordance with the plan. 12 U.S.C. § 2202a(e)(1).

The detail and precision by which Congress set forth borrowers' rights under this

---

al Land Bank of St. Paul, No. A2–88–31 (D.N.D. Apr. 21, 1988) (same), *appeal dismissed,* No. 88–5202 (8th Cir. June 8, 1989); *In re Hilton Land & Cattle,* 101 B.R. 604 (D.Neb.1989) (allowing a private right of action in a bankruptcy action); *Meredith v. Federal Land Bank,* 690 F.Supp. 786 (E.D.Ark.1988) (implicitly allowing private right of action but dismissing for failure to state a claim). *See also Federal Land Bank of St. Louis v. McGinnis,* 711 F.Supp. 952, 958

(E.D.Ark.1989) (granting borrowers an affirmative defense on the basis that creditor failed to comply with the Act but denying relief because parties in question were not borrowers under the Act). *But see Harper v. Federal Land Bank of Spokane,* 878 F.2d 1172 (9th Cir.1989); *Wilson v. Federal Land Bank of Wichita,* No. 88–4058–R, 1989 WL 12731 (D.Kan. Jan. 30, 1989); *Neth v. Federal Land Bank of Jackson,* 717 F.Supp. 1478 (S.D.Ala.1988).

section are powerful indications that Congress intended to confer specific enforceable rights on borrowers. A private cause of action will be readily found " 'where the language of the statute explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff.' " *Universities Research Ass'n v. Coutu*, 450 U.S. 754, 771–72, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981), *quoting Cannon v. University of Chicago*, 441 U.S. 677, 690 n. 13, 99 S.Ct. 1946, 1954 n. 13, 60 L.Ed.2d 560 (1979); *Miener v. State of Mo.*, 673 F.2d 969, 974 n. 4 (8th Cir.1982). The corollary of this is that if a System lender grants the specific rights mandated by the Act, there is no further purpose served by a judicial review of the lender's ultimate decision regarding foreclosure or restructuring. *Coutu*, 450 U.S. at 772, 101 S.Ct. at 1462.

The reasons why Congress found it necessary to adopt such detail and precision are set forth more fully in subsequent sections of this opinion. Suffice to say that earlier efforts of Congress to encourage restructuring of distressed loans had been ignored by many System lenders and Congress intended to remedy this situation.

B. The House Report

The House Report sets forth the twofold purpose of the Act. It stated:

H.R. 3030 *will require* Farm Credit System lenders to restructure the loans of financially-stressed farmer-borrowers, in order to help keep farmers on the land and help turn around the condition of stressed System institutions.

H.R.Rep. No. 295(I), 100th Cong., 1st Sess. 52 (emphasis added), *reprinted in* 1987 U.S.CODE CONG. & ADMIN.NEWS 2723, 2723.

It went on to say:

Much of the impetus for H.R. 3030 derives from the continuing depression in agriculture that began in the early 1980's but whose roots originate in the inflationary period in the late 1960's and 1970's.

&ast; &ast; &ast; &ast; &ast; &ast;

H.R. 3030 * * * looks to the future—to an agricultural delivery system that not only will have dealt sensitively with to-day's financially-stressed farm borrowers but one that will be more competitive, more efficient and more responsive to economic realities.

*Id.* at 53–54, *reprinted in* 1987 U.S.CODE CONG. & ADMIN.NEWS at 2725.

The Report further states that the highlights of H.R. 3030 include:

*Providing enhanced borrowers' rights and require restructuring rather than foreclosure of certain loans.*

*Id.* (emphasis added).

In discussing the testimony of the various witnesses to appear before the House committee, the Report states:

Dozens of witnesses representing farmer and commodity groups testified before the Committee as to two basic weaknesses in the way many System institutions have dealt with its problems. First, System lenders have been exceedingly reluctant to restructure individual loans on a case-by-case basis; and, second, the tensions and pressures on both borrowers and lenders, brought on by financial distress, have caused collapse of the traditional sense of comity and good will between the System and its borrower/owners.

*Id.* at 62, *reprinted in* 1987 U.S.CODE CONG. & ADMIN.NEWS at 2733.

The Report went on to state:

Complaints about the rights of System borrowers being abused at both the association and district levels have been like a constant drumbeat in the offices of some Members of Congress for several years. The package of borrower rights adopted in H.R. 3030 reflect a common sense approach which should have been standard operating procedures in a cooperative, borrower-owned lending system.

*Id.* at 64, *reprinted in* 1987 U.S.CODE CONG. & ADMIN.NEWS at 2735.

C. The Senate Report

In forwarding the Act to the floor of the Senate, the Senate Committee on Agriculture, Nutrition and Forestry stated that the Act called "for a major reorganization of the credit delivery mechanism for Ameri-

can agriculture" to assure economic security for the family farmer and rancher and stability of the Farm Credit System. S.Rep. 230, 100th Cong., 1st Sess., 21 (1987). One of the major elements of this reorganization was the mandated restructuring of distressed loans. This was necessary because System lenders were not restructuring when restructuring was cost-effective. The Act

> requires that System banks and associations receiving assistance must, in turn, assist troubled farmers and ranchers by restructuring their delinquent loans where that restructuring is less costly than foreclosure. Each Farm Credit System (FCS) District, that contains a System institution certified to receive assistance must establish a Special Asset Group to review each loan of a distressed farmer or rancher that is slated for foreclosure.
>
> These restructuring procedures were modeled after the St. Paul FCS District's restructuring program—farmers had their loans restructured when that was beneficial both to the System and the farmer. This program has helped thousands of needy farmers *and* has generated income for the System. Applying these procedures nationally will help alleviate a major drain on the System * * *.

*Id.* at 3. The Senate Report notes that the Senate bill granted farmer-borrowers specific rights to ensure an accurate determination of whether restructuring was cost-effective.

> Title IV provides farmer-borrowers with important rights—including the right to loan information (regarding differential interest rates, loan origination charges, changes in interest rates and loan options) and the right of first refusal to repurchase or lease land formerly owned by a borrower that has been foreclosed on by a System institution. Providing borrowers with advance and accurate loan information will allow them to make better informed financial decisions.
>
> Also, banks and associations *will be required* to use Credit Review Committees to review denials of new loans and

restructuring of distressed loans. In order to both assist the institution, by creating earning assets, and to help the family farmer in all System institutions, the distressed loans of family farmers *must be restructured* under Title IV if the cost of restructuring is less than the cost of foreclosure.

*Id.* at 4–5 (emphasis added).

By granting farmer-borrowers certain specific rights, the Senate also intended to remedy many of the drastic consequences—including the tremendous number of foreclosures forcing farm families out of their homes—caused by the agricultural depression of the 1980's.

> The agricultural depression of the 1980's rivals that of the 1930's in terms of its impacts on farmers.
>
> * * * * * *
>
> Farmers who either began operating in the 1970's or significantly expanded their operations in this period are most affected by the decline in land values because they have the greatest amount of debt. However, even farmers with no debt, who are close to retirement, have seen their net worth and hence their retirement savings stripped away by the collapse of farmland values.
>
> While debt has fallen significantly in the last three years the burden has not been uniformly reduced. Many of those reducing their debt holdings were able to do so because they had relatively low levels of debt relative to their income. Most disturbing to the Committee, the other major group causing the fall in debt has been those farmers forced off their farms as a result of their inability to meet their commitments to lenders. While roughly 40 percent of farmers have no debt some 10–12 percent of farmers holding 37 percent of the total debt are in extreme financial difficulty.

*Id.* at 14.

Senator Boren (D.–Okla.), the Senate manager of the bill, stated upon introduction of the bill to the Senate floor that:

> All institutions *must* restructure an eligible borrower's nonaccruing loan if:

First, it is cheaper to restructure than to foreclose; second, the borrower is applying all income over and above necessary and reasonable living and operating expenses; third, if the borrower has the financial capacity and management skills to protect the collateral; fourth, if the borrower is capable of working out existing financial difficulties.

\*　　\*　　\*　　\*　　\*　　\*

Borrowers who request an appeal to the credit review committee may also request that an independent appraisal of the collateral securing the loan be conducted. If an independent appraisal is requested, the *committee must consider the results of the independent appraisal when making its final determination on the loan.*

133 Cong.Rec. S16831 (1987) (emphasis added).

D. The Conference Report

The Conference Report reiterated the broad goal of the Act previously expressed in the House and Senate Reports. The 1987 Act was enacted, first and foremost, "to provide credit assistance to farmers." H.R.Conf.Rep., No. 490, 100th Cong., 1st Sess., 1. Chairman of the Conference Committee, Representative de la Garza, of Texas, in reading the Conference Report to the House, clearly expressed what the Conference Committee thought to be the driving force for enactment of the Act: "the terrible problem that our farmers and ranchers in rural America have experienced during the past several years." 133 Cong.Rec. H11869 (1987). He went on to say:

Mr. Speaker, I hope that my colleagues will join with us to send the message at this point that we care, *that we would like for them to have another tool at their disposal,* which is credit of an acceptable nature so that they could continue providing us with the excellent food and fiber that they have done in the past.

*Id.* (emphasis added).

Senator McClure (R.–Idaho), upon the return of the Conference Report to the Senate and just before final passage of the Act, expressed the sentiment of Congress in terms that few could misunderstand:

The most important part of this legislation ... is the restructuring of farm loans of financially stressed farmer-borrowers of the System. In order to keep these farmers on the land it is necessary for System banks and associations to change their attitude toward debt restructuring. In the past if a farmer was delinquent or late in payment, it was almost automatic that the bank or association began foreclosure or liquidation action. The banks and associations were not focused on helping the farmer through restructuring. With mounting losses, it became clear that doing business as usual would not suffice. A more lenient attitude was needed. Because this was not forthcoming from the System, Congress made restructuring an integral part of the financial assistance package. If System banks were to receive assistance from the Congress, they must restructure farmer loans where it is cheaper. *This legislation requires restructuring of farmer loans if it is the least cost alternative.*

133 Cong.Rec. S18458, S18469–70 (1987) (emphasis added).

In the light of the above, there certainly can be no quarrel that Congress viewed the Act as responsive to the needs of farmer-borrowers in ways that earlier Farm Credit Acts were not. Moreover, the Act clearly manifests Congress' intent to provide borrowers with the ability to enforce procedures granted to protect them from unjustified foreclosure. This can only be done by implying a private right of action for borrowers. *See, infra,* part G.

Implying a private right of action for borrowers to enforce carefully defined procedures mandated by the language of the Act is also consistent with a further goal of the 1987 Act to strengthen and stabilize the farm credit system. The Act requires lenders to make cost-effective decisions concerning the possibility of restructuring. *See Harper v. Federal Land Bank,* 878 F.2d at 1175 ("the 1987 Act is further reinforced by the fact that a borrower's right

to restructure a delinquent loan is limited to situations in which the cost of restructuring is less than or equal to the cost of foreclosure"). Granting borrowers a private right for injunctive relief requires lenders to weigh the costs of restructuring against the costs of foreclosure before resorting to the latter. Injunctive relief strengthens, rather than weakens, the Farm Credit System by requiring lenders to make a decision based on a thorough review of all factors and procedures deemed important by Congress.

### E. Other Legislative History

When the bill reached the floor of the Senate after committee hearings, Senator Burdick (D–ND) offered an amendment on the Senate floor to expressly provide that *any person* would have a right to sue under the Act. His concern was that the House bill, which conferred an express cause of action only on borrowers, was too narrow, eliminating existing rights.[6] He stated:

Currently, any person has the right to sue these two entities. However, the House provision arguably limits this right to borrowers of the System. This restricts rights of persons who are not yet borrowers, or who are farmer-borrowers, to sue.

My amendment simply cleans up this problem and restores the rights to all persons, whether borrowers or not.

133 Cong.Rec.S. 16995 (December 7, 1987).

Senator Boren (D–Okla.), chairman of the Senate Subcommittee on Agricultural Credit and floor manager for the bill, responded as follows:

I am told that the House has unduly restricted the right of the borrower to bring suit and that this is the proposal in the House bill. It would be my thought ... that we would oppose that House provision in the conference committee. That would have much the same effect as the adoption of the Burdick amendment would have without our attempting to write the actual language of the amendment here on the floor at this time.

Senator Richard Lugar, (R–Ind.), ranking minority member of the Senate Agriculture Committee, stated:

I would confirm the understanding that the distinguished Senator from Oklahoma and I have with the distinguished author of this amendment. We will in fact oppose the House amendment in conference. We understand the problem, and we would appreciate the Senator's not pursuing this amendment on this occasion with that assurance.

*Id.* On the basis of these assurances, Senator Burdick withdrew his amendment and the bill passed.[7]

---

**6.** The House version of the 1987 Act included a provision that gave *borrowers* the right to sue any farm credit institution for violation "of any duty, standard, or limitation prescribed under the Act and owing to the borrower." H.R. 3030, 100th Cong., 1st Sess., 133 Cong.Rec. H7638, H7692 (Sept. 21, 1987).

Senator Burdick was obviously concerned that applicants for loans would be given rights but denied the right to enforce them under the House bill. He wanted to make sure that they, too, had the right to maintain an action to enforce the rights and procedures granted by the Act. His impression that, at the time, any person had the right to sue was not correct. This Circuit, for instance, held in *Redd v. Federal Land Bank of St. Louis,* 851 F.2d 219, 223 (8th Cir.1988) and *Mendel v. Production Credit Ass'n of the Midlands,* 862 F.2d 180 (8th Cir.1988) that a borrower did not have the right to bring an action for damages under the 1985 Amendments to the 1971 Farm Credit Act.

Much of the misunderstanding over the question of whether borrowers had a private right of action at the time Congress enacted the present Act stems from an apparent confusion between common law actions under state law and statutory actions. *See, e.g.,* 133 Cong.Rec. H00000–30 (consideration of H.R. 3030 on the floor of the House of Representatives, statements of Representatives Watkins, Madigan and Glickman). At the time of enactment, some states permitted borrowers to use the Farm Credit Act of 1971 and its Amendments as a defense to foreclosure. *See, e.g., Federal Land Bank of St. Paul v. Overboe,* 404 N.W.2d 445 (N.D.1987). *But see, e.g., Production Credit Ass'n v. Van Iperen,* 396 N.W.2d 35 (Minn.App.1986).

**7.** Senators Burdick, Boren and Lugar, and the other congressmen who spoke, clearly intended that there be some form of judicial enforcement, at least the kind of judicial enforcement that is asked for in the instant case. On the other hand, there is not a single individual senator or congressman who stood up and said, "All

The comments of Senator Boren and Senator Lugar are not, as described by the Bank and the Ninth Circuit in *Harper v. Federal Land Bank of Spokane*, 878 F.2d at 1176, isolated comments in the legislative record selected by plaintiffs to bolster their case. They were the comments by those in Congress responsible for managing the Act through the legislative process, making their statements more indicative of legislative intent than typical statements made during congressional proceedings. It thus seems patently clear that the Democratic and Republican managers of the bill on the Senate floor believed that accepting the House amendment would limit rather than expand the right to bring a private cause of action for the enforcement of the specific provisions of the Agricultural Credit Act.

F. Prior Case Law

The Bank argues that earlier Farm Credit System cases decided by this Court involving the question of implied right to private actions militate against giving such rights here. We do not agree. To the contrary, we believe that the past cases of this Circuit support the right to equitable relief.

In *Allison v. Block*, 723 F.2d 631 (8th Cir.1983), we held that farmers were entitled to declaratory and injunctive relief against the Secretary of Agriculture and other officials enjoining them from foreclosing farm loans obtained from the Farmers Home Administration because the Secretary had failed to promulgate procedural and substantive regulations implementing legislation intended to defer farm loans in certain circumstances. The injunction prohibited the Secretary from foreclosing on farm loans until he had complied with the congressional Act.

In *Wilson, et al. v. Mason State Bank*, 738 F.2d 343 (8th Cir.1984), we held that the Wilsons could not maintain an action

for *damages* against a private bank who had made a loan to the Wilsons under the Emergency Agricultural Adjustment Credit Act of 1978. Pub.L. No. 95–334, 92 Stat. 429–33 (appearing at 7 U.S.C. following section 1947) (1982). We distinguished *Allison v. Block, supra,* on the following grounds:

> *Allison* involved an action by a farmer against the Secretary of Agriculture to enforce the provisions of 7 U.S.C. § 1981a (1982). We found that in section 1981a, it was *Congress's intention to place an affirmative duty on the Secretary of Agriculture to establish procedures* to defer foreclosures on farm loans. We found that the purpose of the amendment was to benefit the farmers subject to foreclosure. We held that the Secretary's failure to establish such procedures was an abuse of discretion and granted the farmer injunctive relief. *Allison*, as such, *provides no support for the Wilsons' attempt to imply a private cause of action to recover money damages* for the Bank's alleged violations of regulations promulgated to protect FmHA.

*Wilson*, 738 F.2d at 345 (emphasis added).

In *State of Iowa, ex rel. Miller v. Block,* 771 F.2d 347 (1985) (Heaney, J., joined by Lay, C.J., with Fagg, J., dissenting), we again granted relief to individual farmers who sought to compel the Secretary of Agriculture to develop a program for the making of "disaster payments" to Iowa farmers who suffered disasters within the meaning of the Act. We noted that:

> It is not the business of this Court to order the Secretary to make payments under the SDPP to specific farmers. But when Congress has created a program which contemplates that such payments will be made in appropriate circumstances, it is the clear duty of the Secretary to promulgate regulations which carry out the intent of Congress.

right constituents, we are giving $4 billion to bail out the Farm Credit System. Along with this, we are going to give farmer-borrowers spe-

cific rights, but we do not intend to make such rights enforceable in court."

*Id.* at 352. We noted the importance of the "imperative language in the statute (*'shall'* make disaster payments)." *Id.* at 355.

In *Redd v. Federal Land Bank of St. Louis,* 851 F.2d 219, 223 (8th Cir.1988), we held that the 1985 Amendments to the 1971 Farm Credit Act did not create an implied right of action *for damages.*

In *Mendel v. Production Credit Ass'n of the Midlands,* 862 F.2d 180 (8th Cir.1988), we followed *Redd* and held that neither the Farm Credit Act of 1971 nor the 1985 Amendments created by implication a private right of action *for damages.* We specifically left open the question of whether farmer-borrowers might have a private right of action to enforce the provisions of the 1985 Amendments.

There are significant differences between the 1985 Amendments and the 1987 Act. The 1985 Amendments did not have a section entitled "Borrowers' Rights." Title III of the 1985 Amendments was entitled: "TITLE III—PROTECTION FOR FARMERS AND OTHER FARM CREDIT SYSTEM BORROWERS; DISCLOSURE AND ACCESS TO INFORMATION." The 1985 Amendments simply required that System lenders shall (1) provide to their borrowers meaningful and timely disclosure of interest rate information,[8] (2) develop a policy of forebearance,[9] (3) provide borrowers copies of loan documents,[10] (4) establish credit review committees,[11] and provide a loan review mechanism.[12]

By 1987, Congress had determined that it simply could not rely on the Farm Credit System to initiate and operate a program and to promulgate regulations to implement that program which would give meaningful relief to distressed farmer-borrow-

**8.** SEC. 4.13. DISCLOSURE.—(a) In accordance with regulations of the Farm Credit Administration System institutions shall provide to their borrowers, for all loans that are not subject to the Truth in Lending Act (15 U.S.C. § 1601 et seq.), meaningful and timely disclosure of the following:

(1) the current rate of interest on the loan;

(2) in the case of an adjustable or variable rate loan, the amount and frequency by which the interest rate can be increased during the term of the loan or, if there are no such limitations, a statement to that effect, and the factors (including, but not limited to, the cost of funds, operating expenses, and provision for loan losses) that will be taken into account by the lending institution in determining adjustments to the interest rate;

(3) the effect, as shown by a representative example or examples, of the required purchase of stock or participation certificates in the institution on the effective rate of interest; and

(4) any change in the interest rate applicable to the borrower's loan.

**9.** SEC. 4.13. DISCLOSURE.—(b) In accordance with regulations of the Farm Credit Administration System institutions shall develop a policy governing forbearance. Each System institution shall provide borrowers with a copy of the institution's policy regarding forbearance at such time or times as the Farm Credit Administration shall prescribe in such regulations.

**10.** SEC. 4.13A. ACCESS TO DOCUMENTS AND INFORMATION.—In accordance with regulations of the Farm Credit Administration System institutions shall provide their borrowers, at the time of execution of loans, copies of all documents signed by the borrower and at any time thereafter, on a borrower's request, copies of all documents signed or delivered by the borrower and at any time, on request, a copy of the institution's articles of incorporation or charter and bylaws.

**11.** SEC. 4.14. RECONSIDERATION OF ACTION ON LOAN APPLICATION.—The Board of directors of each Farm Credit System institution shall establish one or more credit review committee(s), which shall include farmer board representation. Any loan applicant who has received written notice, under section 4.13, of a decision to deny or reduce the loan applied for, if the applicant so requests in writing within thirty days after receiving such notice, may obtain a review of such decision in person before the credit review committee. When a loan applicant requests review of an adverse credit decision, a majority of persons serving on such reviews committee must be persons who were not involved in making the adverse decision. Promptly after any such review, the applicant shall be notified in writing of the credit review committee's decision and the reasons therefor.

**12.** SEC. 307. Each local lending institution of the Farm Credit System established under the Farm Credit Act of 1971 (12 U.S.C. § 2001 et seq.) shall—

(1) review each loan that has been placed in non-accrual status by such institution to determine whether such loan may be restructured based on changes in the circumstances of such institution as the result of this Act and the amendments made by this Act; and

ers.[13]

### G. Alternate Remedies

The Bank argues that Congress has armed the farm credit system with a variety of administrative remedies to assure compliance with the borrowers' rights provisions of the Agricultural Credit Act of 1987 and that by entrusting the Farm Credit Administration (FCA) in the first instance with enforcement of the Act, Congress provided a mechanism that fosters consistency in interpretation and application and minimizes the potential expense and delay of numerous private court challenges to the conduct of institutions within the System. The plain fact, however, is that the FCA is in no position to effectively enforce the borrowers' rights provisions of the 1987 Act. The farm borrowers have no way to invoke the remedial powers of the FCA. There is no procedure for filing charges or complaints. As the Supreme Court noted in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979),

> [Congress] has never withheld a private remedy where the statute explicitly confers a benefit on a class of persons and where it does not assure those persons the ability to activate and participate in the administrative process contemplated by the statute.

There is no such assurance here.

Moreover, this record does not support the view that the FCA has either the ability or willingness to enforce the borrowers' rights provisions. The FCA has viewed its primary responsibility as one of examining the institutions in the System for financial condition, quality of management, soundness and compliance with laws and regulations. The fact is that during 1987 the FCA took only 24 enforcement actions, none of which sought compliance with the borrowers' rights provisions of the 1987 Act.

Finally, even if the FCA with its limited resources wanted to enforce the borrowers' rights provisions of the Act, its authority to issue temporary cease and desist orders is unavailable because such orders can only be issued if the lender's violation

> is likely to cause insolvency or substantial dissipation of assets or earnings of the institution or otherwise seriously prejudice the interests of the investors in Farm Credit System obligations or shareholders in the institution.

12 U.S.C. § 2262(a). Similarly, its authority to suspend or remove officers extends only to those situations involving substantial financial loss, impairment of shareholder interests or personal dishonesty. 12 U.S.C. § 2264(a).

In sum, borrowers are unable to enforce their rights through administrative avenues. *But see Harper v. Federal Land Bank*, 878 F.2d at 1176–77.

## II. ANTI–INJUNCTION ACT

 The district court held that the Zajacs' request for injunctive relief violated the Anti–Injunction Act. The Zajacs disagree, arguing that this case falls squarely in the "expressly authorized" exception to the Anti–Injunction Act. The test to determine whether a federal statute expressly authorizes an injunction against state court proceedings "is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope *only* by the stay of a state court proceeding." *Mitchum v. Foster*, 407 U.S. 225, 238, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972) (emphasis added). Moreover, the federal statute in question does not have to make specific reference to either the Anti–Injunction Act or an injunction of state

---

(2) notify in writing the borrower of each such loan of the provisions of this section.

**13.** Representative Jones of Tennessee, in bringing H.R. 3030 from committee to the floor of the House, stated:

> In summary I want to let the system and FCA know that together they destroyed the integri-

ty of the 1985 Farm Credit Act and necessitated this year's legislation. The Congress cannot tolerate such irresponsible action again and we expect the system and its regulator to diligently undertake their respective responsibilities and to cooperate in those matters that are necessary to ensure that full advantage is taken of the provisions of the new law.

court proceedings. *Id.* at 237, 92 S.Ct. at 2159; *Amalgamated Clothing Workers of America v. Richman Bros. Co.*, 348 U.S. 511, 516, 75 S.Ct. 452, 455–56, 99 L.Ed. 600 (1955).

First, the Federal Land Banks were created by Congress in 1916 as "instrumentalities of the United States." 12 U.S.C. § 2011. Indeed, the entire Farm Credit System itself is uniquely federal because it is created by and exists at the pleasure of the Congress. Also, systemwide requirements of the Agricultural Credit Act of 1987, such as restructuring, are not only uniquely federal; such provisions are absolutely federal.

Second, the congressional purpose underlying the Act will be completely defeated if the Zajacs are not granted injunctive relief to stop the state foreclosure process. Both the House and the Senate were concerned about the System lenders' past abuses of state court foreclosure proceedings.[14] Congress, therefore, enacted the Act to preclude the institution or continuation of a state court foreclosure proceeding until the lender considers restructuring. By temporarily stopping the continuation of a foreclosure proceeding, the Act encompasses the use of injunctions by a federal court to prevent state court foreclosure proceedings in violation of the Act.

The Act, together with its legislative history, establish congressional authorization so that the 1987 Act falls squarely within the "expressly authorized" exception to the Anti–Injunction Act. Thus, the Anti–Injunction Act does not bar injunctive relief in this instance.

## CONCLUSION

We thus conclude that farmer-borrowers have a private right of action to enforce the borrowers' rights provisions of the Act, one of which requires that, on review, an independent appraiser be named on the request of the farmer-borrower.[15] We go no fur-

133 Cong.Rec. H11869, H11873 (December 18, 1987).

**14.** In the instant case, the Bank used state court foreclosure proceedings once the Zajacs could not meet their financial obligations. By enacting the 1987 Act, Congress attempted to require System lenders to evaluate the economics of restructuring before resorting to the drastic remedy of foreclosure. When introducing one of the Senate bills, Senator Pryor explained:

The Farm Credit System was established to ensure the existence of a viable source of credit on reasonable terms for farmers at times when the market will not provide such credit. The Farm Credit System's historical mission has been to strengthen participation in agriculture, by broadening the availability of credit to borrowers ... Unfortunately, during the crises of the past few years the managers of the Farm Credit System seem to have forgotten whom their cooperative was established to serve. In many parts of the country the Farm Credit System looked to foreclosure as a first resort rather than a last resort.... The bill that we introduce today is aimed at reestablishing Farm Credit System policies that will help farmers in need of help and at preserving local control of the Farm Credit System.

S. 1156, 100th Cong., 1st Sess., 133 Cong.Rec. 6102–03 (May 6, 1987).

Senator Melcher, upon introduction of the second Senate bill, stated:

Before this crisis becomes a disaster, Mr. President we must do something to lift this crushing burden from the back of rural Amer-

ica. We must get system interest rates down and stop the wholesale foreclosure and forced liquidations of family farms and ranches.

S. 1665, 100th Cong., 1st Sess., 133 Cong.Rec. 11725 (August 7, 1987).

**15.** In *Harper,* the Ninth Circuit in applying *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975), apparently concluded the 1987 Act was not enacted for the "especial" benefit of farmer-borrowers. *Harper v. Federal Land Bank of Spokane,* 878 F.2d at 1174–75. We disagree. There can be no doubt that farmer-borrowers are a protected class under the Act because its language and structure established broad rights for borrowers and mandatory duties for lenders. A private cause of action will be readily found "where the language of the statute explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff." *Universities Research Ass'n v. Coutu,* 450 U.S. 754, 771–72, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981), *quoting Cannon v. University of Chicago,* 441 U.S. 677, 690 n. 13, 99 S.Ct. 1946, 1954 n. 13, 60 L.Ed.2d 560 (1979); *Miener v. State of Mo.,* 673 F.2d 969, 974 n. 4 (8th Cir.1982).

Certainly, Congress drafted the 1987 Act with an "unmistakable focus on the benefitted class," farmer-borrowers. *Cannon,* 441 U.S. at 691, 99 S.Ct. at 1955; *Hofbauer v. Northwestern Nat. Bank of Rochester,* 700 F.2d 1197, 1200 (8th Cir.1983). This is not a case where the provisions in question were primarily concerned with lenders rather than borrowers. *Hofbauer,* 700 F.2d at 691. There is no better evidence of this "unmistakable focus" than the fact that the 1987 Act permits only borrowers to initiate the procedures enacted within the "borrowers

ther than that in this case.[16] We do not suggest that, if the borrowers' rights provisions are followed and the credit review committee still decides to deny the request to restructure, we will review the reasonableness of that decision. We have no intention of interjecting ourselves into credit decisions of a System lender if the lender complies with the statutorily mandated procedures. Our view is that Congress enacted the Act in the belief that System lenders would act wisely if they complied with such procedures. With respect to the procedure at issue here, Congress wanted to ensure that there was an independent appraisal in the record so that the farmer-borrower could effectively argue his case before the credit review committee and that the committee would base its decision on all relevant information. We believe that it would be inappropriate for us to refuse to enforce this specific procedure.

As a final argument, the Bank asserts that its failure to grant the Zajacs' request for an independent appraisal is plainly harmless under the circumstances of this case. The Bank's assertion may well be true, but its request fails to recognize the limited scope of the rights granted to borrowers by Congress and, thereby, the limited scope of the remedies available to federal courts pursuant to the Act. By asking to evaluate the harmlessness of the Bank's decision, the Bank asks this Court to evaluate whether the credit review committee's decision to foreclose is reasonable in light of an independent appraisal prepared by the Zajacs. This sort of question—whether a credit review committee's decision is reasonable—is a type of judicial inquiry clearly not authorized by the Act or desired by Congress. This Court can enforce only those specific procedures granted to protect borrowers. We therefore remand this matter to the district court with directions to enjoin the Bank from foreclosing on the

property in question until such time as the Bank complies with the mandated procedures found in the borrowers' rights provisions of the Act.

FAGG, Circuit Judge, dissenting.

For the reasons stated by the Ninth Circuit in *Harper v. Federal Land Bank of Spokane*, 878 F.2d 1172 (9th Cir.1989), I do not believe farmer-borrowers have an implied cause of action to enforce the borrowers' rights provisions of the Agricultural Credit Act of 1987. Thus, I would affirm the district court.

rights" provisions of the Act. Moreover, to conclude otherwise ignores the fact that the Federal Credit System was created specifically to provide capital for farmers.

**16.** Such a rule will not result in costly litigation for System lenders. Enforceable rights of borrowers are limited, requiring only specific in-

junctive relief. There will be the need for only limited discovery and pleadings. Moreover, we have not held that damages are available. Ultimately, if the System lenders follow the narrowly prescribed rules set forth in the Act, this Court will not permit an action to proceed into the merits of the System lender's decision to foreclose rather than restructure.